IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| REGINALD JACKSON, | ) Civil Action No. 4:01-02129-HMH-TER |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

This is an action brought pursuant to Section 205(g) of the Social Security Act ("Act"), as

amended, 42 U.S.C. § 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying the claim of the plaintiff, Reginald

Jackson ("plaintiff"), for Supplemental Security Income ("SSI") disability benefits under Title XVI

of the Act, 42 U.S.C. § 1381-1383f. The only issues before the Court are whether the Commissioner's

findings of fact are supported by substantial evidence and whether proper legal standards have been

applied. This case was referred to the undersigned for a report and recommendation pursuant to Local

Rule 73.02(B)(2)(a), (D.S.C.).

## I. PROCEDURAL HISTORY

On March 17, 1999, plaintiff's grandmother, Mary Alice McCall ("Mrs. McCall"), filed an

application for SSI on behalf of plaintiff, who was then ten years old, alleging a disability onset date

of January 1, 1998.[1] Plaintiff's alleged disabilities included nervousness, headaches, pain and weakness in the legs, difficulty sleeping, and effects of child abuse. (Tr. 36-39, 53). Plaintiff's claim was denied initially and upon reconsideration. (Tr. 21-22). Plaintiff requested a hearing before an administrative law judge ("ALJ"), which was held on September 15, 2000, before ALJ D.F. Billett. The plaintiff and Mrs. McCall were present at the hearing and were not represented by an attorney. Mrs. McCall testified. (Tr. 23-33). On November 28, 2000, ALJ Billett issued an unfavorable decision denying plaintiff's application for SSI. (Tr. 13-18). [2] On January 9, 2001, Mrs. McCall retained the services of an attorney, who submitted new and additional evidence and requested a review of the hearing decision by the Appeals Council ("AC"), on January 12, 2001. (Tr. 8-09, 201-204, 205-239). On April 20, 2001, the AC acknowledged receipt of five additional exhibits, but declined review. (Tr. 5-7). On May 1, 2001, plaintiff filed a complaint in this Court seeking judicial review of the final decision of the Commissioner. On September 20, 2001, the Court issued its order, granting the Commissioner's motion to remand the case under sentence six of 42 U.S.C. § 405(g), and remanded the case to the Social Security Administration ("SSA") for further administrative

---

[1] According to plaintiff's briefs, this is the date that plaintiff was placed in Mrs. McCall's permanent care by the Department of Social Services, after being removed from the custody of his mother due to allegations that he and his sister were victims of physical neglect and physical and/or sexual abuse by the mother and her boyfriend. (See Pl. Br. 3; Pl. R. Br. 2; Tr. 25, 53, 141, 164, 165, 205, 303, 312).

[2] In his November 28, 2000 decision, ALJ Billett found that plaintiff had "severe" limitations of a learning disability, anxiety, and attention deficit-hyperactivity disorder. However, the ALJ determined that plaintiff's impairments did not meet or medically or functionally equal the requirements of any listing. After determining that plaintiff's subjective complaints, and the allegations made on his behalf, were not fully credible considering both medical and other evidence, the ALJ found that plaintiff had less than marked limitations in cognitive/communicative functioning and concentration, persistence and pace, and marked limitations in the area of social functioning. Thus, because he found that plaintiff had no extreme limitations in any broad functional area, nor marked limitations in at least two broad functional areas, the ALJ determined that plaintiff was not disabled. (Tr. 13-18).

proceedings. (Tr. 267-273).[3]

On June 24, 2002, the case came for a supplemental hearing, again before ALJ Billett. By the time of this hearing, however, plaintiff had already been adjudged disabled pursuant to a subsequently filed application of March 21, 2001 (Tr. 260-261) or March 1, 2001 (Tr. 339). (Tr. 260, 265, 321, 339-340). The only issue, therefore, before the ALJ at the supplemental hearing was whether plaintiff was disabled during the period beginning March 1999, the date of his first application, through February 2001, the month before the filing of the subsequently allowed application. (Tr. 261, Pl. Br. 3). At the supplemental hearing on June 24, 2002, plaintiff and Mrs. McCall were present, along with their attorney. Mrs. McCall testified. (Tr. 316-341).[4] ALJ Billett

---

[3] On remand, the court ordered the AC to vacate the administrative decision currently before the court and remand the case to an ALJ with the following instructions: to provide a supplemental hearing and, if appropriate, fully explain the reasons for finding plaintiff less that fully credible in accordance with SSR 96-7p; to fully explain the rationale for determining plaintiff's functional limitations; and, to specifically address the evidence which was submitted to the AC. (Tr. 267-273).

On December 5, 2001, the AC vacated the November 8, 2000 final decision and ordered that the case be remanded to the ALJ, with the following instructions:

> In assessing the claimant's functional limitations, the decision first states "there is no evidence that the claimant has limitations of any specific function" (TR. 17). It is then stated, "he may experience some limitation in broad areas of development and functioning" TR.17). The decision appears to have adopted the assessments of limitations reported by the State agency medical consultants, i.e. marked limitations in social functioning, less than marked limitation in cognitive functioning and in concentration, persistence and pace, and no evidence of limitation in personal and motor functioning (TR. 150-55, 161-64). The hearing decision, however, does not identify the evidence relied on in determining the claimant's functional limitations, and the statement that there was "no evidence that the claimant has limitations of any specific function" appears to be a mischaracterization (TR. 17). The Appeals Council believes that the case would benefit from a further review and a closer evaluation of the evidence. In doing so the evidence previously submitted but not addressed will be included in the re-evaluation (TR. 5-6, 201-39)....Upon its receipt, the case will be assigned to an Administrative Law Judge pursuant to the order of the Appeals Council. The Administrative Law Judge will comply with the court order, provide the claimant an opportunity to appear at a hearing, develop the record pursuant to 20 C.F.R. §§ 404.1512-404.1518 and/or 416.912-416.918, and issue a new decision.

(Tr. 274-275)

[4] According to her testimony at the supplemental hearing, plaintiff's grandmother, Mrs. McCall, adopted plaintiff approximately a year before the supplemental hearing, thus becoming his adoptive mother. Tr. 319.

3

issued a second unfavorable decision, on September 25, 2002, denying plaintiff's 1999 application for SSI disability benefits for the period March 17, 1999 through February 28, 2001. The ALJ found that plaintiff's impairments did not meet, medically equal, or functionally equal the requirements of a listed impairment during that time period. The ALJ determined that plaintiff had no extreme limitations and only one marked limitation (in acquiring and using information), therefore, he found that plaintiff was not disabled at any time prior to February 28, 2001. (Tr. 260-265). On October 25, 2002, plaintiff's attorney filed exceptions to the ALJ's decision and a request for the AC to review the ALJ's decision in the supplemental hearing. (Tr. 256). On March 27, 2007, the AC issued a notice denying plaintiff's request for review, thus making the ALJ's decision of September 25, 2002, the "final decision of the Commissioner after remand." (Tr. 254-255). (See 20 C.F.R. § 416.1484(b) and 42 U.S.C. § 405(g), sentences six through nine.) On May 29, 2007, the Commissioner filed a motion to reopen the case in this Court, based on the Court's continuing jurisdiction pursuant to its original order of September 20, 2001, which had remanded the case to the Commissioner for further administrative action, under sentence six of 42 U.S.C. § 405(g).[5] On October 3, 2007, the Court issued its order granting the Commissioner's motion to reopen this case.

## II. FACTUAL BACKGROUND

---

[5] In his brief, the Commissioner notes that "[p]laintiff then chose to file exceptions to the ALJ's decision with the Appeals Council," and he states in a footnote that "[a]fter a case is remanded by a federal court, a claimant is not required to file exceptions to the ALJ's decision in order to obtain judicial review," citing 20 C.F.R. § 416.1484. (Def. Br. 3). In his brief, plaintiff notes that "[i]ncredibly, four and a half years passed before the Appeals Council issued a Notice Declining Review on March 27, 2007. (Tr.pp. 254-255). No explanation was given for this outrageously long delay." (Pl. Br. 3). The undersigned notes that the last part of sentence six of 42 U.S.C. § 405(g) provides that:

> the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based. 42 U.S.C. § 405(g)

Plaintiff was born on March 28, 1988. He was fourteen years old at the time of the supplemental hearing in June 2002. During the relevant time period (March 1999 through February 2001), he was ten to twelve years old and a third-, fourth-, and fifth-grade student. (Tr. 36, 87, 288). Plaintiff has no past work experience. (Tr. 61).

### III. DISABILITY ANALYSIS

The plaintiff's argument consists of the following, quoted verbatim:

1. The ALJ's finding that Reggie was not markedly impaired in his ability to interact and relate with others is not supported by substantial evidence.

In ALJ Billett's decision of September 25, 2002, he made the following findings of fact and conclusions of law in determining that "based on the application filed on March 17, 1999, the claimant was not eligible for supplemental security income under Sections 1602 and 1614(a)(3)(c) of the Social Security Act:"

1. The claimant has never engaged in substantial gainful activity.

2. The claimant has anxiety, an impairment which causes more than minimal limitations and is thus "severe" within the regulatory definition.

3. The claimant has an underlying impairment which could reasonably cause some functional limitations, but evaluation of the evidence shows that the subjective allegations are not credible to cause marked and severe functional limitations through February 28, 2001 (SSR 96-7p).

4. Through February 28, 2001, the claimant did not have a medically determinable physical or mental impairment or combination of impairments which resulted in marked and severe functional limitations.

5. Through February 28, 2001, the claimant had no impairment or combination of impairments which met or medically or functionally equaled the requirements of a listing in the Listings of Impairments in Part B or Part A of Appendix 1, Subpart P, Regulations No. 4.

6.      The claimant was not under a "disability," as defined in the Social Security Act, at any time through February 28, 2001.

The Commissioner asserts that the evidence in this case was more than sufficient under the substantial evidence standard of review to support the ALJ's finding that plaintiff's limitations in interacting and relating with others were less than marked. (Def. Br. 11).

Under the Act (42 U.S.C. §§ 405(g) and 1383(c)(3)), this Court's scope of review of the Commissioner's final decision is limited to determining: (1) whether the decision of the Commissioner is supported by substantial evidence, and (2) whether the legal conclusions of the Commissioner are correct under controlling law. Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir. 1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978). "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion." Richardson v Perales, 402 U.S. 389, 390 (1971). Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The Court's scope of review is specific and narrow. It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. §§ 405 (g) and 1383(c)(3); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability determination for a child under the age of eighteen is well established. Under Sections 1602 and 1614(a)(3)(c) of the Act (42 U.S.C. §§ 1381a and 1382c(a)(3)(c)) and pursuant to SSA Regulations and Rulings (see 20 C.F.R. §§ 416.906, 416.924, and SSRs 09-1p, 09-2p, 09-3p, 09-4p, 09-5p, 09-6p, 09-7p, 09-8p) the specific issue is whether the

claimant is "disabled." A "child"[6] who applies for SSI is "disabled" if the individual is not engaged in "substantial gainful activity"[7] and has a "medically determinable physical or mental impairment or combination of impairments"[8] which causes "marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(C)(I) and (ii); 20 C.F.R. § 416.906. A medically determinable impairment is not "severe" if it is only a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c). To result in marked and severe limitations, the impairments must meet or medically or functionally equal a listing in the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.911(b)(2). The SSA determines childhood disability under its functional equivalence rule using the "whole child" approach, pursuant to SSR 09-1p.[9] To functionally equal a

---

[6] 42 U.S.C. § 1382c(c) defines a "child" as an individual who is neither married nor (as determined by the Commissioner of Social Security) the head of a household, and who is (1) under the age of eighteen, or (2) under the age of twenty-two and (as determined by the Commissioner of Social Security) a student regularly attending a school, college, or university, or a course of vocational or technical training designed to prepare him for gainful employment."

[7] 20 C.F.R. § 416.972 defines substantial gainful activity as work activity, even if such work is done on a part-time basis for less pay or with less responsibility than previous work, that involves doing significant physical or mental activities. The work activity is work that is usually done for pay or profit, whether or not a profit is realized. Generally, activities such as taking care of oneself, household tasks, hobbies, therapy, school attendance, club activities, or social programs are not considered to be substantial gainful activity.

[8] 42 U.S.C. § 1382c(a)(3)(D) defines "a physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.908 states "Your impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms (see § 416.927)."

[9] This technique of looking first at the child's actual functioning in all activities and settings and considering all domains that are involved in doing those activities, accounts for the interactive and cumulative effects of the child's impairment(s), including any impairments that are not "severe." Specifically, the SSA considers the following questions: (1) how does the child function (at home, at school, and in the community)?; (2) which domains are involved in performing the activities?; (3) could this child's medically determinable impairment(s) account for limitations in the child's activities?; (4) to what degree does the impairment(s) limit the child's ability to

listing, an impairment(s) must be of listing-level severity; that is, it must result in "marked" limitations[10] in two domains of functioning or an "extreme" limitation[11] in one domain. 20 C.F.R. § 416.926a(a). Domains are broad areas of functioning intended to capture all of what a child can or cannot do.[12] The SSA uses the following six domains: (I) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself, and (vi) health and physical well-being.[13] 20 C.F.R. § 416.926a(b)(1). There are seven general factors to be considered when evaluating a child's

---

function age-appropriately in each domain? SSR 09-1p.

[10] A "marked" limitation is one which interferes seriously with the ability to independently initiate, sustain, or complete activities. Day-to-day functioning may be seriously limited when an impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning expected to be found on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. 20 C.F.R. § 416.926a(e)(2).

[11] An "extreme" limitation is one which interferes very seriously with the ability to independently initiate, sustain, or complete activities. Day-to-day functioning may be very seriously limited when an impairment(s) limits only one activity or when the interactive and cumulative effects of an impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating given to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning expected to be found on standardized testing with scores that are at least three standard deviations below the mean. 20 C.F.R. § 416.926a(e)(3).

[12] The "whole child" approach recognizes that many activities require the use of more than one of the abilities described in the first five domains, and that they may also be affected by a problem that is considered in the sixth domain. A single impairment, as well as a combination of impairments, may result in limitations that require evaluation in more than one domain. Conversely, a combination of impairments, as well as a single impairment, may result in limitations that are rated in only one domain. Therefore, it is incorrect to assume that the effects of a particular medical impairment must be rated in only one domain or that a combination of impairments must always be rated in several. Rather, adjudicators must consider the particular effects of a child's impairment(s) on the child's activities in any and all of the domains that the child uses to do those activities, based on the evidence in the case record. SSR 09-1p.

[13] In the sixth domain of "health and physical well-being," a "marked" limitation exists if the child is frequently ill or has frequent exacerbations of any impairment. "Frequent" means the episodes occur on an average of three times a year or once every four months lasting two weeks or more, or more than three times or once every four months not lasting two weeks, or less than three times a year or once every four months but last longer that two weeks if the overall effect is equivalent in severity. An "extreme" limitation exists if a child is ill or has exacerbations from impairments which result in significant, documented symptoms or signs substantially in excess of the requirements for showing a "marked" limitation. 20 C.F.R. §§ 416.926a(e)(2)(iv) and 416.926a(e)(3)(iv).

functioning: (1) how the child's functioning compares to the functioning of children of the same age who do not have impairments; (2) the combined effect of multiple impairments; (3) how well the child can initiate, sustain, and complete activities, including the amount of help or adaptations needed, and the effect of structured or supportive settings, i.e. how independent the child is compared to same-age children without impairments; (4) unusual settings, (e.g. how a child functions in unfamiliar or one-to-one settings compared to his/her usual settings at home, at school, in childcare or in the community); (5) early intervention and school programs; (6) the impact of chronic illness and limitations that interfere with the claimant's activities over time; (7) the effects of treatment (including medications and other treatment). (See 20 C.F.R. § 416.924a(b) and SSR 09-1p.)

## IV. MEDICAL RECORDS AND OTHER DOCUMENTARY EVIDENCE

The undersigned has reviewed the medical records and other documentary evidence and finds many of the reports relevant to the issues in this case. The documentary evidence as set out by the Commissioner in his brief has not been disputed by the plaintiff. Therefore, the undisputed medical records and other documentary evidence as stated by the Commissioner are set forth herein.[14]

When she applied for SSI on plaintiff's behalf in March 1999, plaintiff's grandmother, Mrs. McCall, reported that plaintiff had friends his own age, could make new friends, generally got along with adults and teachers and played team sports. (Tr. 46).[15]

On April 7, 1999, Laurie Fraser, plaintiff's third-grade teacher, reported that plaintiff

---

[14] The undersigned has included such additional relevant evidence from the ALJ's decision and/or the case record, in the form of footnotes to this section.

[15] Mrs. McCall checked the response block "Yes" to the above-noted questions on the SSA function report. In response to most of the primary questions on the function report (i.e ."Is the child's ability to communicate limited? Is the child's ability to progress in learning limited? Are the child's physical abilities limited? Does the child's impairment(s) affect his or her behavior with other people? Does the child's impairment(s) affect his or her ability to help himself or herself and cooperate with others in taking care of personal needs? Is the child's ability to pay attention and stay on task limited?"), Mrs. McCall checked the response block "Not sure." (Tr. 43-48).

was sometimes able to play alone or with others, but tended to fight often, had little self-control, behaved inappropriately in class and with adults, and was rude and disrespectful. (Tr. 88).[16] On April 8, 1999, Ms. Fraser reported that plaintiff still had difficulty controlling himself and had been suspended for fighting. (Tr. 109).[17] On April 22, 1999, Christie Bouchillon, M.Ed., a guidance counselor at plaintiff's school, stated that plaintiff's behavior had improved somewhat in class and that he had more self-control. (Tr. 102). She stated that plaintiff was overly loud in class, had trouble staying in his seat, and was sometimes verbally and/or physically aggressive with other children. (Tr. 102). Ms. Bouchillon also stated that Plaintiff had many friends and a good sense of humor. (Tr. 102).[18]

The records of Marion Intermediate School indicate that plaintiff was suspended for three days in March 1999 for "assault." (Tr. 120-21).[19]

In June 1999, a state agency psychologist reviewed plaintiff's records and concluded that he

---

[16] Additionally, Ms. Fraser noted that plaintiff fought quite often (several times a month), and got aggressive. (Tr. 88).

[17] Additionally, Ms. Fraser noted that she had seen no improvement in plaintiff's behavior while he had been on medication. (Tr. 109).

[18] Ms. Bouchillon also noted that, when interacting with other children, plaintiff at times lost his self-control; that plaintiff was easily provoked and responded to those acts with aggression (verbal and/or physical); and that, while he had a lot of friends, they often fussed with each other. (Tr. 102).

[19] The records also indicate that plaintiff was suspended for one day in November 1998, one day in December 1998, one day in January 1999, and two days in February 1999. Additionally, plaintiff had nine excused absences, one unexcused absence, and one absence pending excuse at the time of the report. (Tr. 120). The accompanying discipline detail report for the 1998-1999 school year indicated that plaintiff received the following discipline: corporal punishment, on September 9 and 15, 1998, for interference with instruction; time-out in the office, on October 23, 1998, for interference with instruction; parental visitation and the aforementioned in-class suspension, on November 17, 1998, for disrespectful, obscene, profane behavior; detention, on December 2, 1998, for interference with instruction; the aforementioned suspension, on December 15, 1998, for assault; the aforementioned suspension, on January 18, 1999, for battery/fighting; the aforementioned suspensions, on February 8 and 19, 1999, for interference with instruction; and the aforementioned three-day suspension, on March 15, 1999, for assault. (Tr. 121).

had marked limitation in social functioning. (Tr. 161-64).

In September 1999, J. Joe Neeley, Ph.D., reported that he had been seeing plaintiff biweekly since April 1999. (Tr. 139). Dr. Neeley stated that plaintiff's anxiety symptoms (i.e., headaches, leg and arm pain, and other bodily sensations) interfered with his ability to concentrate and attend in school, but that he had "no significant problems in other spheres." (Tr. 139-40).[20]

In September 1999, Brandy M. Bunn, plaintiff's fourth-grade teacher, reported that plaintiff was in a self-contained class all day; was able to play with others and develop friendships; picked on other students and sought attention constantly; did not interact appropriately with adults; was a behavior problem in class; and had much trouble following orders from adults. (Tr. 143-44).[21]

In December 1999, two State agency psychologists reviewed plaintiff's records and concluded

---

[20] Dr. Neeley also provided a report to plaintiff's pediatrician, Dr. Vege Rao, on October 13, 1999, in which he stated that he had seen plaintiff, his younger sister, and his grandparents since January 1999, when they were referred to him by DSS after plaintiff and his sister, Laquita, were removed from the care of their biological mother due to allegations of physical neglect and physical and sexual abuse. Dr Neeley noted that:

> Most of my work in recent months has centered around Reginald. In my opinion, he carries a generalized anxiety disorder (300.02). He displays a number of anxiety symptoms such as headaches, leg and arm pains, and crawling sensations on his skin. I think he is quite a tense and insecure youngster who has experienced an extremely difficult early childhood. His sister appears to be much more resilient than Reginald and is displaying no similar symptoms. He does seem to be making small gains as he remains in the home of his grandparents. I did refer Reginald during the summer to Dr. Roy Skinner here in Florence for a general medical evaluation and to ascertain if there were any indications of a possible neurological involvement. Apparently, this produced no positive results. I currently see Reginald approximately once a month, with his grandparents and his sister. I would anticipate continuing a similar level of involvement with Reggie."

(Tr. 205).

[21] At the supplemental hearing, the ALJ found that: during the 1998-1999 school year, plaintiff was in the third grade; he should have been in the fifth grade, but he had been retained twice; in April 1999, it was determined that he qualified for special education as a learning disabled student with concomitant emotional problems; he was placed in a resource class for one period a day, five days a week, beginning with the 1999-2000 school year; and, according to the testimony at the supplemental hearing, plaintiff received homebound instruction after January 2001. (Tr. 262-263). An SSA report of teacher contact from Marion Intermediate School teacher Brandy M. Bunn, indicates that, as of September 13, 1999 plaintiff was "in a self-contained classroom all day long, [where] [a]ll subjects are taught and social/behavioral skills are [a] major priority." (Tr. 143-144).

that he had marked limitation in social functioning. (Tr. 150-53).

The records of Marion Intermediate School indicated that plaintiff received the following discipline during the period from December 1999 through November 2000: a conference for disorderly conduct on the bus in December 1999; an in-school suspension for disrespectful behavior in March 2000; a conference and two bus suspensions for failure to follow requests on the bus in September 2000; "other" discipline for disrespect to staff in October 2000; a bus suspension for disorderly conduct in October 2000; and an in-school suspension for interference with instruction in November 2000. (Tr. 228).[22]

On April 24, 2000, a Child and Adolescent Initial Clinical Assessment form concerning plaintiff was completed at Pee Dee Mental Health Center. (Tr. 303-08). Under the heading of "School Information," it was noted that plaintiff's biggest problems in school were disruptive behavior, academic problems, conflicts with peers, suspensions/expulsions and conflicts with teachers. (Tr. 304). Under the heading of "Social History," it was noted that plaintiff played well with other children, was playful and very affectionate, but that "fighting occur[red]" at times. (Tr. 305).

The records of Marion Pediatrics indicate that plaintiff's diagnoses in May 2000 were attention deficit hyperactivity disorder (ADHD) and anxiety attacks. A doctor at a mental health facility had just changed his medications to Paxil, Trazodone and Clonodine. (Tr. 172).

Progress notes of Nieves Iglesias, M.D., plaintiff's treating psychiatrist, in May 2000, reflect that plaintiff's diagnosis was Overanxious Disorder and that plaintiff was "somatically preoccupied." (Tr. 237). Dr. Iglesias stated: "Grandmother is seeking disability for [plaintiff] which I feel is not

---

[22] The accompanying attendance detail record indicates that plaintiff was absent fifteen days during the period from August 7, 2000 through December 6, 2000, with eight excused absences and seven unexcused absences. (Tr. 227).

necessary since [plaintiff] is very capable of functioning [within normal limits]." (Tr. 237).[23]

A Marion Intermediate School Conference Summary, dated November 3, 2000, indicated that plaintiff was missing much school and falling far behind and that homebound instruction would be considered if he were absent for an extended amount of time. (Tr. 233). It was also noted that Mrs. Graham, one of plaintiff's teachers, did not consider him a behavior problem. (Tr. 233).

On January 3, 2001, plaintiff was admitted on an emergency basis to William S. Hall Psychiatric Institute after he became "angry with his teacher secondary to having recess and points taken away." (Tr. 312).[24] It was noted that plaintiff "was screaming, cursing, hitting, kicking and spitting on his teacher and principal" and that he attempted to spit on and bite medical personnel at the hospital (Tr. 312). During the admission, plaintiff had problems with cursing, rudeness to staff, fighting, threatening staff, lying and "having a bad attitude." (Tr. 314). Plaintiff was discharged on January 19, 2001, with diagnoses of post-traumatic stress disorder, chronic, and oppositional defiant disorder, and a GAF score of 65. (Tr. 315).[25]

---

[23] The record also reflects that Dr. Iglesias treated plaintiff from May 2000 through March 2001, during which time he prescribed the medications Paxil, Catapres, and Desyrel for plaintiff. In late May 2000, Dr. Iglesias discontinued Catapres, and added Clonidine. (Tr.299-302). Paxil is used to treat depression, obsessive-compulsive disorder, anxiety disorders, post-traumatic stress disorder, and premenstrual dysphoric disorder. Catapres and Clonodine are used to treat ADHD and high blood pressure. Desyrel is used to treat anxiety and depression. See http://www.drugs.com/.

[24] The "List of Exhibits Admitted in Connection with Court Remand" in the case record indicates that plaintiff's hospital records from his sixteen-day admission to Hall Psychiatric Institute were submitted as Exhibit 21F, subsequent to the supplemental hearing. (Tr. 4B, 312-315).

[25] A Global Assessment of Functioning (GAF) score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed. 1994). Plaintiff's GAF score upon admission was 55. (Tr. 315). A score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks ) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers )."

## V. ADMINISTRATIVE HEARING TESTIMONY

At the hearing on September 15, 2000, Mrs. McCall testified that plaintiff was twelve years old and a fifth grade student in special education. (Tr. 244-45). She testified that his main problems were dizziness, headaches and nervousness. (Tr. 247-51). She testified that plaintiff played with other children who lived with him, but did not play during recess at school because of dizziness. (Tr. 247-49). She testified that plaintiff was loud and "fidgety" at school. (Tr. 250).

At the hearing on June 24, 2002, Mrs McCall testified that plaintiff had been receiving homebound instruction instead of attending school since January 2001, after his admission to William S. Hall Psychiatric Institute, and had been receiving SSI since March 2001. (Tr. 320-21). She indicated that plaintiff's "problems with discipline . . . caused him some problems in terms of having to stay out" of school. (Tr. 320). She testified that plaintiff had hallucinations and talked to people who were not there. (Tr. 324-25). She testified that before March 2001, plaintiff had crying spells every day. (Tr. 325-26). She testified that he did not play often but sometimes played with his sister and other children and that he had friends. (Tr. 328-31).

## VI. PLAINTIFF'S SPECIFIC ARGUMENT

Plaintiff's only allegation of error is the ALJ's finding that he had less than marked limitations in his ability to interact and relate with others. Plaintiff contends that the ALJ correctly found that he was markedly impaired in his ability to acquire and use information, but that the evidence also required a finding that his limitations were marked in the area of his ability to interact and relate with others. Plaintiff's brief recounts the evidence in the case record of the neglect and abuse he

experienced before coming to live with his grandmother/adoptive mother, his alleged impairments;[26]

his failure of two of the first four grades; his placement during the 1999-2000 school year in special

education courses as a learning disabled student with concomitant emotional problems; and his switch

to homebound instructional status following his January 2001 outbursts at school and resulting

sixteen-day hospitalization at the William S. Hall Psychiatric Institute. (Pl. Br. 4). Plaintiff contends

that the ALJ's determination that he had less than marked limitation in his ability to interact and relate

with others was "apparently based solely on one teacher's comment in the report dated November 3,

2000. In that report, one teacher stated that Reggie was "not a behavior problem." (Tr. 233)." (Pl. Br.

5) Plaintiff points to the evidence of his school disciplinary record,[27] which he alleges contradicts that

characterization, and argues that the ALJ "chose to cherry pick that one statement and fail[ed] to even

address the overwhelming contrary evidence in the record." (Pl. Br. 6). Plaintiff argues that the ALJ's

decision  "fails to even mention [plaintiff's] significant outbursts at school in January 2001" and his

subsequent hospitalization and diagnoses of chronic post-traumatic stress disorder and oppositional

defiant disorder, asserting that "it is difficult to conceive of more convincing evidence of an extreme

limitation in a person's ability to interact and relate with others." (Pl. Br. 5). Plaintiff contends that,

in the very least, the evidence reveals a marked limitation in this domain.(Pl. Br. 6).

Plaintiff argues that the case has been heard twice by an ALJ and that it was the Commissioner

who moved for a remand after the first hearing. During the appeal from the second decision (which

---

[26] These include nightmares, flashbacks, anxiety attacks, poor appetite, visual and auditory hallucinations, and crying spells, as well as long-term somatic complaints, including the sensation that something was crawling inside his body (causing him to rub his arms, chest and head to the point of causing hair loss), leg weakness, headaches, chest pain, and dizziness. (Tr. 262, 298, 312, 313).

[27] "School discipline records show fifteen separate disciplinary offenses from September 9, 1998 through November 24, 2000." (Pl. R. Br. 3).

was pending before the AC for four and a half years before the AC declined to review it), the plaintiff asserts that the Commissioner found him to be disabled (pursuant to his subsequent application for SSI disability benefits) as of March 2001, "without the necessity of even an ALJ hearing." (Pl. Br. 6). Finally, plaintiff argues that, given the fact that he has been deprived of benefits to which he is entitled for over eight years, the Court should award him benefits, along with interest, dating from March 1999 (Pl. Br. 7) or, alternatively, remand the case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings. (Pl. R. Br. 5).

The Commissioner argues that the evidence in this case was more than sufficient under the substantial evidence standard of review to support the ALJ's finding that plaintiff's limitations in interacting and relating with others were less than marked. The Commissioner points out that the ALJ found that, during the period March 1999 through February 2001, plaintiff had "marked limitations in the domain of acquiring and using information; less-than-marked limitations in his ability to attend and complete tasks; less-than-marked limitations in his ability to interact and relate with others; and no limitations in the domains of his ability to move about and manipulate objects, ability to care for self, and health and physical well-being (Tr. 264)." (Def. Br. 10). The Commissioner argues that the opinion of Dr. Neeley, plaintiff's treating psychologist (who reported in September 1999, that plaintiff's anxiety symptoms interfered with his ability to concentrate and attend in school, but that plaintiff had "no significant problems in other spheres" (Tr. 139-40)), and the opinion of Dr. Iglesias, plaintiff's treating psychiatrist, (who stated in May 2000 that plaintiff was "somatically preoccupied," and that Ms. McCall's efforts to obtain disability benefits for plaintiff were "not necessary" because plaintiff was "very capable of functioning [within normal limits]" (Tr. 237)), constituted substantial evidence in support of the ALJ's decision, even in the absence of other supportive evidence. (Def. Br.

11). The Commissioner asserts that "[a]lthough Fourth Circuit case law does not require that a treating physician's opinion be given controlling weight, "the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician," citing <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1993). (Def. Br. 11). The Commissioner cites <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987), for the proposition that "a treating physician's opinion may only be disregarded if there is "persuasive contradictory evidence." (Def. Br. 12). Furthermore, the Commissioner argues, the opinions of Drs. Neeley and Iglesias were particularly persuasive in this case because they were specialists in the fields of psychology and psychiatry and, under 20 C.F.R. § 416.927(d)(5), the opinion of a specialist about medical issues related to his or her area of specialty is entitled to more weight than the opinion of a source who is not a specialist.

The Commissioner argues that, while some of the evidence of record could support a finding that plaintiff had marked limitations in social functioning, other evidence of record also supported the ALJ's finding that plaintiff's social functioning ability was less than markedly impaired, e.g. Mrs. McCall's report of March 1999 that plaintiff had friends his own age, could make new friends, and generally got along with adults and teachers (Tr. 46); the statement of plaintiff's guidance counselor, Ms. Bouchillon, in April 1999, that although Plaintiff was sometimes aggressive towards other children, he had many friends (Tr. 102); the Pee Dee Mental Health Center's assessment of plaintiff in April 2000, wherein it noted that he played well with other children and was very affectionate (Tr. 305); the November 2000 statement of Ms. Graham, one of plaintiff's teachers, that she did not consider him to be a behavior problem (Tr. 233); and the assessment of the William S. Hall Psychiatric Institute in January 2001 following an episode of oppositional defiant behavior, that plaintiff's GAF score was 65, indicating only some mild symptoms or some difficulty in social, occupational, or

school functioning"(Tr. 315). (Def. Br. 12-13). Finally, citing <u>Smith v. Chater</u>, 99 F.3d 635, 638 (4th Cir. 1996), <u>Shively v. Heckler</u>, 739 F.2d 987, 990 (4th Cir. 1984) and <u>Millner v. Schweiker</u>, 725 F.2d 243, 245 (4th Cir. 1984), the Commissioner contends that it is immaterial that the evidence *could* support a conclusion which is inconsistent with that of the Commissioner's because, under the substantial evidence standard of review, the opinions of the plaintiff's treating psychologist and psychiatrist, along with the other evidence noted above, constitute "sufficient probative evidence" to support the ALJ's finding. (Def. Br. 13).

Plaintiff argues in reply that, to be "substantial," evidence must rise to the level of relevant evidence that a reasonable mind might accept as adequate to support a conclusion, based on a review of the entire record. Citing <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990), plaintiff asserts that "[t]he requirement that a denial [of disability] be supported by substantial evidence precludes the Commissioner from being able to selectively choose wisps of facts favorable to a denial while ignoring all remaining evidence that overwhelmingly requires a finding of disability." (Pl. R. Br. 3-4). Plaintiff asserts that "[t]here is no requirement that a person with marked problems interacting and relating with others have absolutely no relationships with family members or friends" and that "one teacher's statement at one point in time that she did not consider [plaintiff] to be a behavior problem must be considered in light of the fact that, approximately sixty days later, [plaintiff] had to be removed from school by the county and sent to a psychiatric hospital." (Pl. R. Br. 4). Plaintiff argues that the Commissioner found him disabled as of March 2001 pursuant to another application and "there is nothing in the record to indicate that [he] was any "less disabled" from March 1999 until February 2001 or that he suddenly experienced any significant worsening of his condition in February 2001." (Pl. R. Br. 5).

The medical opinion of a treating physician is entitled to controlling weight, i.e. it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. <u>See</u> 20 C.F.R. § 404.1527(d)(2), SSR 96-2p, and <u>Mastro v. Apfel</u>, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded significantly less weight." <u>Craig v. Chater</u>, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." <u>Mastro v. Apfel</u>, 270 F.3d at 178 (citing <u>Hunter v. Sullivan</u>, 993 F.2 31, 35 (4th Cir. 1992). The ALJ is not entitled to substitute his own judgment for the opinion of a treating physician on the issues of the nature and severity of the claimant's impairment. SSR 96-2p.

In determining what weight to give the opinions of medical sources, the ALJ must apply all of the factors in 20 C.F.R. § 404.1527(d)(1)-(6), which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors. <u>See</u> SSR 96-2p; <u>Hines v. Barnhart</u>, 453 F.3d 559, 563 (4th Cir. 2006). Furthermore, 20 C.F.R. § 404.1527(d)(2) states: "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." SSR 96-2p requires that "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight

the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

Here, the ALJ complied with the requirements for evaluating opinions of Drs. Neeley and Iglesias as set forth in 20 C.F.R. § 416.927. Dr. Iglesias's opinion was supported by the clinical evidence and was corroborated by Dr. Neeley's opinion. Dr. Iglesias's opinion was consistent with substantial evidence in the record concerning plaintiff's functioning during the period from early 1999 through January 2, 2001. However, on January 3, 2001, plaintiff was admitted on an emergency basis to William S. Hall Psychiatric Institute where he remained until January 19, 2001. Plaintiff was discharged with a diagnoses of post-traumatic stress disorder, chronic, and oppositional defiant disorder, and a GAF score of 65.

In evaluating plaintiff's subjective complaints, as related by Mrs. McCall, ALJ Billett explained that he "d[id] not find the allegations credible to result in marked and severe limitations." (Tr. 264). The ALJ appropriately referred to SSR 96-7p and the list of factors to be considered in making a credibility determination, pursuant to the requirements of Fourth Circuit case law and SSA regulations. The ALJ stated:

> Considering the claimant's activities; the lack of hospitalizations[28] or emergency room visits; the absence of findings of underlying abnormality through February 2001 to account for the claimant's complaints of chest pain, dizziness, leg giving away, etc.; the absence of report of side-effects attributable to medication through February 2001; the report of November 1999 that the claimant was not a behavior problem; and Dr. Iglesias' opinion in May 2000 that the claimant could function within normal limits, I do not find the allegations credible to result in marked and severe functional limitations.

(Tr. 264).

---

[28] The ALJ's finding as to the "lack of hospitalizations or emergency room visits" obviously refers to the period from the date of plaintiff's application for SSI benefits, on March 17, 1999, until his hospitalization at Hall Institute, from January 3-19, 2001, (Tr. 312-315), subsequent to which he was determined to be disabled - as of March 2001 - pursuant to another SSI application that he filed in March 2001. (Supra p. 3).

However, the ALJ's finding of an "absence of [physical or psychological] findings of underlying abnormality through February 2001 to account for claimant's complaints of chest pain, dizziness, leg giving away, etc." is not fully supported by the substantial evidence of record in regards to the date. As previously discussed, plaintiff was admitted to William S. Hall on January 3, 2001, until his discharge on January 19, 2001, with a diagnoses "of post-traumatic stress disorder, chronic, and oppositional defiant disorder, and a GAF score of 65." The ALJ had determined that prior to March 2001, when he was determined to be disabled subsequent to his other SSI application, plaintiff was not disabled. Plaintiff was diagnosed with general anxiety disorder by Dr. Neeley in April 1999. (Tr. 141-142, 205). Plaintiff was also diagnosed with attention deficit hyperactive disorder (ADHD) in October 1999. (Tr. 148). The ALJ's findings are also supported up until the date of January 2001 by the findings of Susan Vandergriff and Anna Gregg Fowler, School Psychologists, the examiners who conducted the April 1999 psychoeducational evaluation of plaintiff. They stated that, during the testing, "no distractibility was noted" and plaintiff "persevered well even with difficult tasks," and "his activity was normal for a student his age." (Tr. 103-108, 262, 264 ). Plaintiff was not diagnosed with post-traumatic stress disorder and oppositional defiant disorder until January 3, 2001, after his emergency placement in William S. Hall. Therefore, the undersigned finds that as of January 2001, plaintiff should have been found disabled.

## CONCLUSION

"Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (quoting Craig v. Chater,

76 F.3d 585, 589 (4ᵗʰ Cir. 1996)). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance" of the evidence. See Laws v. Celebreeze, 368 F.2d 640, 642 (4ᵗʰ Cir. 1966); Richardson v. Perales, 402 U.S. 389, 401 (1971); Hays v. Sullivan, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990); Hunter v. Sullivan, 993 F.2d 31, 34 (4ᵗʰ Cir. 1993). When reviewing an ALJ's decision under the substantial evidence standard, the court cannot "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." Johnson v. Barnhart, 434 F.3d 650, 653 (4ᵗʰ Cir. 2005), citing Craig, 76 F.3d at 589. In this case, because plaintiff had been found disabled as of March 2001 based on a subsequent SSI application, the ALJ limited his consideration to the period from March 1999 through February 2001. As set forth above, plaintiff's arguments fail to show that the ALJ's decision was not based on substantial evidence up through the date of January 2001.

Based upon the foregoing, the undersigned finds there is sufficient support for the ALJ's decision up through the date of January 3, 2001. Therefore, it is RECOMMENDED that the Commissioner's decision be reversed to the extent that plaintiff should be found disabled as of January 3, 2001.

Respectfully submitted,

s/Thomas E. Rogers, III
January 8, 2010                              Thomas E. Rogers, III
Florence, South Carolina                     United States Magistrate Judge